**UNITED STATES of America,**
**Appellant/Cross–Appellee,**

v.

**Carlos RESTREPO, Jorge Orrego, Carlos Andrade, Jose Rincon, Aguilera Martinez, Alexander Lara, Moises Gomez, Jose Rivera, Omar Ospina and Ana Ruiz, Defendants,**

**Alexander Lara, Aguilera Martinez, Carlos Andrade, Omar Ospina, Defendants–Appellees,**

**Ana Ruiz, Jose Rivera, Defendant–Appellees/Cross–Appellants.**

Nos. 20–22, 148, 149 and 386.

Dockets 89–1596, 89–1637, 89–1667, 90–1046, 90–1150 and 90–1178.

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 1990.

Decided June 12, 1991.

Beryl A. Howell, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. and David C. James, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellant/cross appellee.

William Mogulescu, New York City (Levinson, Mogulescu and Kaplan, New York City, of counsel), for defendant-appellee Alexander Lara.

James Cohen, New York City (Lincoln Square Legal Services, Inc., New York City, of counsel), for defendant-appellee Aguilera Martinez.

Vincent F. Siccardi, Kew Gardens, N.Y. (Mario Malerba, Kew Gardens, N.Y., of counsel), for defendant-appellee Carlos Andrade.

Jerald Levine, Jackson Heights, N.Y., for defendant-appellee/cross appellant Ana Ruiz.

Miguel A. Gonzalez, Bronx, N.Y., for defendant-appellee Omar Ospina.

Carlos Perrez Olivo, Bronx, N.Y., for defendant-appellee/cross appellant Jose Rivera.

Before PRATT, MAHONEY and WALKER, Circuit Judges.

MAHONEY, Circuit Judge:

On January 4, 1989, officers of the New York Drug Enforcement Task Force made ten arrests in connection with a seizure of approximately $18,300,000 in cash narcotics proceeds, firearms, financial and narcotics records, and other items from four different locations in Queens and Nassau counties, New York. Six of the arrestees—Alexander Lara, Aguilera Martinez, Carlos Andrade, Omar Ospina, Ana Ruiz, and Jose Rivera—pled guilty to a money laundering charge, *see* 18 U.S.C. § 1956(a)(1)(A)(i) (1988), and Rivera pled guilty to several additional charges. They were thereafter sentenced by the United States District Court for the Eastern District of New York, Charles P. Sifton, *Judge*, principally to varying terms of imprisonment.

The government appeals from all the sentences, challenging the district court's imposition of terms of imprisonment below those specified by the Sentencing Guidelines. The grounds for these downward departures included: (1) the minimal roles of Lara, Martinez, and Andrade; (2) the view that obstruction of justice by Ruiz and Rivera was offset by their incarceration for civil contempt; (3) the finding that Ruiz' involvement was due in part to the influence of her paramour, defendant Carlos Restrepo; and (4) the belief that Ospina's sentence would otherwise be disproportionate to the sentences imposed upon certain of his codefendants.

Ruiz cross-appeals, contending that the district court failed adequately to consider both her presentence report and a memorandum submitted on her behalf by the National Center on Institutions and Alternatives ("NCIA"), a private organization that proposes sentencing alternatives, resulting in a due process violation. Rivera also cross-appeals, but argues on appeal only that the district court improperly sentenced him.

We affirm the sentences of Lara, Martinez, and Andrade. We vacate the sen-

tences of Ospina, Ruiz, and Rivera, and remand for resentencing.

## Background

### A. *The Offense Conduct.*

In December 1988, agents of the New York Drug Enforcement Task Force began surveillance of the Zoom Furniture and Appliance Warehouse in Queens, New York. The agents determined that no legitimate business was being conducted at the warehouse, and seized duct tape containing cocaine residue from its trash. As observation continued, agents followed a vehicle that had previously been observed at the warehouse to a residence at Olcott Street in Queens, where the driver twice left the house carrying a beeper to place calls from a nearby public telephone. Later in the month, agents observed a U–Haul truck arrive at the warehouse, followed by a red Taurus automobile. As the truck exited through the garage door of the warehouse, agents spotted a GMC truck parked inside.

On January 4, 1989, agents who were surveilling the Olcott Street residence followed a vehicle from there to a house in Great Neck, New York. Later that day, Restrepo and Ruiz were observed arriving at the Great Neck residence in the previously identified red Taurus. They left the house two hours later, and followed a heavily laden Astro van driven by Ospina to a warehouse in Maspeth, Queens. Along the way, Restrepo drove the Taurus in a manner indicative of countersurveillance, frequently changing lanes as he and Ruiz examined the occupants of nearby vehicles.

The Astro van entered the Maspeth warehouse, while Restrepo and Ruiz went into a diner across the street and stationed themselves at a table with a view of the warehouse. After consulting twice with a man who came from the warehouse to the diner, Restrepo and Ruiz drove the Taurus directly to, and shone its lights upon, a nearby police surveillance vehicle. As that vehicle drove away, the Taurus followed it out of the neighborhood.

While this pursuit was occurring, the warehouse door opened and the agents entered the warehouse. Inside, they saw Andrade and Lara run to the rear of the building, discovered Martinez hiding in the back seat of a car, and found Ospina in the driver's seat of the previously sighted GMC truck. Further, the agents came upon bundles of cash in a compartment beneath two loose floorboards of the truck. Upon their return to the warehouse in the Taurus, Restrepo and Ruiz were also apprehended.

A search warrant was then obtained for the two Queens warehouses, as well as the Olcott Street and Great Neck residences. At the Maspeth warehouse, agents seized $18.3 million in cash from the GMC truck, semiautomatic weapons, and approximately thirty-five boxes of handwritten notes reflecting amounts of money and denominations. They found at the Great Neck home approximately $630,000 in cash, money counting machines and wrappers, a machine gun, and financial records that depicted the laundering of over $43 million during the prior three months. Additionally, Rivera was arrested at the home after admitting that he lived there. The agents discovered $5,000 in cash and a pistol at the Olcott Street residence, and narcotics records at the Zoom warehouse. Finally, traces of cocaine were found in hidden compartments of the GMC truck and the Astro van in the Maspeth warehouse.

### B. *The Guilty Pleas.*

In satisfaction of a four count indictment, Lara, Martinez, Andrade, Ospina, and Ruiz pled guilty to a count that charged the conduct of a financial transaction involving the proceeds of narcotics distribution with the intent to promote that unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (1988). The government agreed that: (1) each defendant was entitled to a two-level reduction under the Sentencing Guidelines for acceptance of responsibility; (2) the amount of money involved in the charged financial transaction was $18.3 million; (3) Lara, Martinez, Andrade, and Ruiz were entitled to a four-level reduction for their minimal roles in the offense; and (4) no obstruction of justice or criminal contempt charges would be brought against Ruiz for her refusal to

provide handwriting exemplars. Subsequently, after commencement of his trial with three codefendants, Rivera pled guilty to the four counts with which he was charged.[1]

At the time of their pleas, all six defendants-appellees admitted that they understood the seized cash to be narcotics proceeds. In addition, Andrade and Martinez confessed their role in packing and loading the money, and Lara said he "was at the door looking out and waiting to help load up the money." Ospina stated that he brought the GMC truck to the warehouse and helped load it, and Ruiz that she acted as a lookout from the diner. Finally, Rivera admitted counting the cash, recording amounts, and agreeing to disguise its source and facilitate its exportation.

C. *The Sentences.*

A presentence report ("PSR") was prepared for each defendant. The guideline calculations in the PSRs for Lara, Andrade, and Martinez were essentially identical. The base offense level for the money laundering charge was 23, *see* U.S.S.G. § 2S1.1(a)(1), to which three levels were added for knowledge that the funds were narcotics proceeds, *see id.* § 2S1.1(b)(1), and nine levels for the stipulated amount of funds involved, *see id.* § 2S1.1(b)(2)(J). The PSRs further specified reductions of two levels for acceptance of responsibility, *see id.* § 3E1.1(a), and four levels for minimal role in the offense, *see id.* § 3B1.2(a). The district court accepted these calculations, which yielded an adjusted offense level of 29, and then departed downward four additional levels on the ground that the defendants' minimal involvement in the offense was not adequately accounted for in the Sentencing Guidelines. The sentencing range for offense level 25 is 57–71 months, and each of these defendants was sentenced to 60 months imprisonment.

Using the same calculations described above, Ruiz' PSR also reached an adjusted offense level of 29. At sentencing, the government successfully argued for a two-level enhancement on the theory that Ruiz' refusal to provide handwriting exemplars pursuant to subpoena constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1. The district court offset this increase, however, with an equivalent downward departure, concluding that the Guidelines did not adequately reflect that Ruiz' failure to produce exemplars resulted in imprisonment for civil contempt, especially in a situation where a subsequent guilty plea mooted the prior effort to obstruct justice. In addition, the district court departed at least two levels lower on the ground that Ruiz had been "misled" by Restrepo, and ultimately sentenced Ruiz to 72 months.[2]

The PSR for Rivera applied the grouping rules of U.S.S.G. §§ 3D1.2 and 3D1.4. This resulted in an adjusted offense level of 39, computed from a base offense level of 23 for section 1956(a)(1)(A)(i) money laundering and the related conspiracy, *see* U.S.S.G. §§ 2S1.1(a)(1), 2X1.1(a), and increases of three levels for Rivera's knowledge that the money was derived from narcotics distribution, *see id.* § 2S1.1(b)(1); eleven levels because of the amount of money involved, *see id.* § 2S1.1(b)(2)(L); and two levels for obstruction of justice, *see id.* § 3C1.1. A two-level decrease for acceptance of responsibility, *see id.* § 3E1.1(a), resulted in a total offense level of 37.

The district court sentenced Rivera at offense level 34, which called for a range of 151–188 months, to 155 months imprisonment. The two-level obstruction enhancement for refusal to provide court-ordered handwriting exemplars was not applied. Instead, it was taken into account in determining where within the guideline

---

1. In addition to a section 1956(a)(1)(A)(i) count, Rivera pled guilty to an additional substantive money laundering count charging violation of 18 U.S.C. § 1956(a)(1)(B)(i) (1988), and to counts charging conspiracies to distribute narcotics in violation of 21 U.S.C. § 846 (1988) and to engage in a money laundering transaction in violation of 18 U.S.C. § 371 (1988).

2. The district court did not specify Ruiz' final adjusted offense level before imposing sentence. The 72–month sentence that Ruiz received fell within the ranges prescribed for offense levels 26 and 27, in view of her criminal history rating.

range Rivera would be sentenced. In addition, Rivera was denied credit for a period in excess of six months during which he obstructed justice before purging himself of civil contempt.[3] It is unclear from the district court's sentencing comments whether the further departure of an additional level to 34 was attributable to a determination that Rivera's role is "appropriately considered a minor one," or to "uncertainty as to the amount of money involved in [Rivera's] activities."

Ospina's PSR calculated an offense level of 35 for the money laundering charge, after adjusting for his knowledge of narcotics proceeds and the $18.3 million involved in the warehouse raid. There was also a two-level enhancement for obstruction of justice because Ospina, after pleading guilty, perjured himself at a suppression hearing, but an amendment to the PSR provided an offsetting two-level reduction for Ospina's minor role in the offense.

Accepting all other calculations in the PSR, the district court rejected the reduction for Ospina's role on the ground that his conduct could not appropriately be classified as minor. Nevertheless, the district court downwardly departed four levels to offense level 33 and sentenced Ospina to the minimum sentence at that range, 135 months. The basis for this departure was "recognition of the fact that the guideline and calculations do not ... adequately appreciate the factual complexities of this case, that is the different roles of the defendants in this multi-defendant case and also don't adequately recognize a degree of acceptance of responsibility which is present in this case;" *i.e.,* "the relative role of this defendant *vis-a-vis* others, the relative degree of acceptance of responsibility."

## Discussion

### A. *Departure for Minimal Participation.*

While conceding that Lara, Andrade, and Martinez were entitled under U.S.S.G.

§ 3B1.2 to a four-level reduction for their minimal roles, the government contends that the additional four-level downward departures for minimal participation were both legally incorrect and unsupported by the record.

■ The departure standards are by now familiar. The district court has discretion to sentence below the range specified by the guidelines if it determines "that there exists a[ ] ... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a [lower] sentence." 18 U.S.C. § 3553(b) (1988); *see* U.S.S.G. § 5K2.0, p.s. A district judge's legal conclusion that a given circumstance justifies departure is subject to our *de novo* review, while the clearly erroneous standard governs a factual finding that the circumstance is present. *See United States v. Jagmohan,* 909 F.2d 61, 64 (2d Cir.1990).

The government argues that minimal participation cannot constitute a ground for departure because the adjustments for mitigating role contained in U.S.S.G. § 3B1.2 establish that the Commission accounted for this factor. The government relies on *United States v. Paulino,* 873 F.2d 23 (2d Cir.1989) (per curiam), and *United States v. Reina,* 905 F.2d 638 (2d Cir.1990), for the proposition that departure is unwarranted where a particular circumstance has already been factored into the guidelines calculations. These cases, however, are not particularly instructive. *Paulino* held only that, in light of U.S.S.G. § 3B1.2, a district court cannot exceed its discretion by *refusing* to depart downwardly on the basis of minimal role. 873 F.2d at 25. *Reina* similarly involved a rather narrow issue, deciding only that 18 U.S.C. § 3553(e) (1988) and U.S.S.G. § 5K1.1 unambiguously establish that a motion by the government

---

**3.** It would appear from the Rivera sentencing minutes that the two-level obstruction enhancement was not applied in the first instance. In the case of Ruiz, on the other hand, it appears that the enhancement was imposed, but was balanced by a compensating two-level downward departure. In both cases, credit was denied for time served under the related civil contempt sanctions.

is a prerequisite to downward departure for cooperation with law enforcement. 905 F.2d at 640–41.

The government's position is plainly inconsistent with the intention of Congress and the Sentencing Commission. Section 3553(b) authorizes departure where a factor is present "to a degree" not adequately considered by the Commission. The Commission's policy statement elaborates as follows:

> [T]he court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines (e.g., as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

> Where, for example, the applicable offense guideline and adjustments do take into consideration a factor listed in this subpart, departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense.

U.S.S.G. § 5K2.0, p.s.[4]

Indeed, we have recognized the possibility of departure beyond the adjustments made available by U.S.S.G. §§ 3B1.1 (aggravating role) and 3B1.2 (mitigating role), based upon a defendant's extraordinary role with respect to the offense of conviction. *See United States v. Joyner,* 924 F.2d 454, 461 (2d Cir.1991) (acknowledging possibility of role "so extraordinarily minute that [defendants] deserved a departure beyond the four-level maximum reduction available for 'minimal' participation"); *United States v. Colon,* 905 F.2d 580, 585–86 (2d Cir.1990) (recognizing potential upward adjustment beyond that provided by guidelines for aggravating role in the offense); *cf. United States v. Bierley,* 922 F.2d 1061, 1066–71 (3d Cir.1990) (ruling that a downward departure for minimal role may be granted where no section

3B1.2 adjustment is possible because defendant is sole participant in offense).

▉▉▉ We conclude that where, as here, an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense, a downward departure may be warranted on the ground that minimal participation exists to a degree not contemplated by the guidelines. With respect to Lara, Andrade, and Martinez, the adjustment for the amount of cash involved in the money laundering charge was an increase of nine levels. The effect was dramatic. This single factor raised the total offense level, after calculating all other adjustments, from 20 (with a range of 33–41 months) to 29 (with a range of 87–108 months).

Significantly, the commentary accompanying U.S.S.G. § 2S1.1 explains: "The amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, *and the extent to which the defendant aided the enterprise.*" (Emphasis added.) The Commission apparently contemplated some connection between the quantity of money implicated and the extent of a defendant's participation in the offense. The district court found such a connection lacking, however, with respect to these unusually situated defendants, who, according to their PSRs, "were laborers whose sole function was to load the boxes of money at the warehouse on January 4, 1989." This is simply a recognition that when an aggravating factor is translated to a sliding scale of offense levels, the assumptions underlying that translation cannot fairly reflect every possible case. *Cf.* U.S.S.G. § 2F1.1, comment. (n.10) (increasing the offense level for crimes of fraud based upon monetary loss may require downward departure if the seriousness of the offense is thus overstated).

The government further argues that the commentary accompanying section 3B1.2 demonstrates that the Commission con-

---

**4.** We quote the provision as it currently reads. Insubstantial differences in language existed at

the time of sentencing.

sidered the type of case at issue here. That commentary provides as an example of an appropriate candidate for minimal role adjustment "someone who played no other role in a very large drug smuggling operation than to offload part of a single marijuana shipment." U.S.S.G. § 3B1.2, comment. (n.2). Thus, the government contends, section 3B1.2 adjustment addresses the situation presented in this case, and further downward departure cannot be justified under the guidelines.

Admittedly, the quoted example indicates that an adjustment for minimal role should adequately address most small players in a large criminal enterprise. Nonetheless, the example does not address the spiralling effect that the amount of cash had on these defendants, particularly in light of its assumed link with their role in the enterprise. We accordingly find no error in the district court's conclusion that departure was warranted.

Nor do we find the record unsupportive of the district court's position. Although at the time of arrest Lara possessed the key to the warehouse and Andrade had a beeper, the probation department, after interviewing the surveillance agent and reviewing the facts of the case, concluded that the roles of Andrade, Martinez, and Lara were limited to loading the boxes of money. In addition, the government offered evidence that these defendants, as well as Ospina, were the subjects of an unsuccessful scheme to arrange their escape from federal custody through the bribery of New York City police officers. *See United States v. Ahuja,* 936 F.2d 85 (2d Cir.1991). The government had no evidence that the defendants were aware of this development, but asked the court to infer that such efforts were unlikely without the escapees' consent. We cannot say that the court clearly erred by refusing to resolve this issue in the government's favor.

■ We also find no error in the district court's selection of a four-level downward departure. The extent of any downward departure is subject to the test of reason-ableness. *See Joyner,* 924 F.2d at 462; *United States v. Alba,* 933 F.2d 1117, 1123 (2d Cir.1991). That test is met here, although it might have been helpful for the district court to address on the record any analogous guideline adjustment, such as the four-level adjustment for minimal role in the offense. *See Joyner,* 924 F.2d at 461–62.

## B. *Departure Based on Incarceration for Contempt.*

Upon their arrest, all six defendants-appellees were held without bail in pretrial detention. Subsequently, on March 16, 1989, Judge Sifton found Ruiz and Rivera in civil contempt for failure to produce subpoenaed handwriting exemplars, and directed that their future confinement would be credited toward any sentence ultimately imposed only after they produced the exemplars. Ruiz purged her contempt by pleading guilty on July 10, 1989. Rivera purged his contempt by submitting a handwriting sample on October 5, 1989, although Judge Sifton, in selecting a sentence within the chosen guidelines range, considered evidence that Rivera had disguised his handwriting while providing the sample.

As previously mentioned, the district court found that the intransigence of Ruiz and Rivera constituted obstruction of justice, but neutralized the otherwise applicable two-level increase in view of their contempt sanctions.[5] The court explained at Rivera's sentencing hearing:

> I am ... concerned about the increase in the offense level for obstruction of justice, not because there doesn't seem to me a factual basis for saying he obstructed justice. He refused to obey a court order. But ... that obstruction of justice is already going to be taken into account by the sentence of civil contempt which was imposed on him which will deny him credit for the time he has already been in jail for the period of time between my ordering him to supply hand-

5. *See supra* note 3.

writing exemplars and his supplying them.

Similarly, at Ruiz' sentencing, the court observed "that it's a very powerful argument that the civil contempt sentence either adequately expressed ... what we're trying to do in charging people with obstruction of justice or ought to be the ground for a downward departure to sort of neutralize it."

■■■ As a preliminary matter, we note our disagreement with the district court's legal analysis insofar as it equated the goals of civil contempt and the sentence enhancement for obstruction of justice. Unlike the punitive character of a sentence enhancement, imprisonment under the recalcitrant witness statute is a coercive remedy, the sole purpose of which is to compel the production of information pursuant to court order. *See In re Grand Jury Proceedings*, 862 F.2d 430, 432 (2d Cir.1988) (per curiam). We have accordingly held that time served in civil contempt need not be credited toward a subsequent criminal sentence arising from persistent contumacious conduct. *See Ochoa v. United States*, 819 F.2d 366, 369–72 (2d Cir.1987); *see also In re McClanahan*, 612 F.2d 642, 643 (2d Cir.1979), *cert. denied*, 445 U.S. 954, 100 S.Ct. 1606, 63 L.Ed.2d 790 (1980); *United States v. Dien*, 598 F.2d 743, 744 (2d Cir.1979) (per curiam). Given the distinction between the coercive nature of civil contempt and the punitive nature of a sentence enhancement for obstruction of justice, we see no basis for confinement pursuant to a proper contempt citation to justify forgoing an obstruction enhancement.

■■ For present purposes, however, it is enough that we find the district court's departure unreasonable on the facts presented. *See* 18 U.S.C. § 3742(e)(3), (f)(2) (1988) (sentences outside applicable guideline range subject to review for reasonableness). Ruiz was sentenced to a term of 72 months imprisonment, whereas she would have faced a sentencing range of either 78–97 or 87–108 months absent the compensating two-level downward departure. Similarly, Rivera was sentenced to 155 months, instead of a term within a guideline range of 188–235 months. Thus, because Rivera spent approximately four months of her pretrial detention under a contempt citation, the district court sentenced her at either six or fifteen months below the bottom of the applicable guideline range. For his less than seven months in contempt, Rivera was sentenced at thirty-three months below the guideline minimum.

The plainly anomalous result is that the defendants reaped a substantial sentencing benefit from their confinement for contempt of court. Further, that confinement was not a significant hardship, but merely a change in the formal status of their imprisonment, since they were subject to pretrial detention in any event. Finally, to the extent that the district court considered it inequitable to impose a contempt sanction with respect to conduct that generated a mandatory sentence enhancement, it had at its disposal the far more reasonable remedy of simply vacating the civil contempt orders and allowing the defendants credit for their confinement in contempt. We therefore vacate the sentences of Ruiz and Rivera.

■■■ We address one final point regarding Rivera. The government contends that in light of his obstruction of justice, it was inappropriate to reduce Rivera's offense level for acceptance of responsibility. We disagree. Although the relevant guideline commentary states that obstruction of justice "ordinarily indicates that the defendant has not accepted responsibility," it recognizes that this may not be so for "extraordinary cases." U.S.S.G. § 3E1.1, comment. (n.4). Further, the sentencing judge is best situated to evaluate the defendant's acceptance of responsibility, *id.* (n.5), and his determination will be set aside only if it is clearly erroneous, *see United States v. Charria*, 919 F.2d 842, 849 (2d Cir.1990). Judge Sifton could properly find Rivera's acceptance of responsibility to have been exceptional. Rivera pled guilty to all charges in a four count indictment, and admitted in some detail his activities in connection with the criminal enterprise.

### C. *Departure for Being Misled and Ruiz' Cross-appeal.*

 Having concluded that Ruiz must be resentenced, we believe it appropriate that the district court consider additional matters upon remand. In addition to the departure described above, the district court granted Ruiz an additional downward departure on the ground that she had been "misled" by Restrepo. At their sentencing, Restrepo briefly asked the court for leniency toward Ruiz:

> I would like Your Honor to be aware of lifestyle in Columbia [sic]. We Columbians [sic] are machos—we always like to tell our women what to do. I want my woman to do what I tell her. So, what I'm asking is for you to please be compassionate with her.... If possible, I'll serve her time.

Shortly before imposing sentence, Judge Sifton described a related departure for Ruiz as follows:

> In a way Mr. Restrepo, I'm doing what you ask but not for the reasons that you stated. Nobody serves another person's sentence in this country. But I'm taking into account what you told me, ... which I'll accept to the degree of giving some credit in terms of a departure for Ms. Ruiz[.] I accept the proposition that you misled this young lady and that you should be sentenced more severely for that and she less severely because of it.

The government contends that, in this context, the departure was grounded on Ruiz' "sex, national origin and socio-economic status," considerations that are "not relevant in the determination of a sentence." U.S.S.G. § 5H1.10, p.s. On the record before us, we are unsure as to the reasons for the district court's departure or the number of levels it departed.

Judge Sifton's finding that Ruiz was "misled" may have been influenced by a memorandum submitted in her behalf by the NCIA. The memorandum was based upon "extensive personal interviews with Ms. Ruiz," and contended that Ruiz was unaware of the money laundering operation until Restrepo, on the night of the arrest, explained why they were watching out for police from the diner. If the court intended to adopt this assertion as a factual finding, departure might well be justified.

It is far from clear, however, that Judge Sifton accepted this version of the facts. Significantly, he declined to grant Ruiz the four-level departure for minimal role that was accorded to the defendants who loaded boxes at the Maspeth warehouse. In addition, the probation department's presentence report concluded that Ruiz was part of the criminal scheme earlier that night, acting as a lookout for suspicious vehicles as Restrepo followed the Astro van to the warehouse. Accordingly, we direct the district court to reconsider on remand the factual and legal basis for this departure, and to clarify the guideline calculation to which the departure relates.[6]

The remand obviates the need for our consideration of Ruiz' cross-appeal. Her sole contention is that the district court failed expressly to address her argument that she was entitled to the same downward departure for minimal role that codefendants Lara, Martinez, and Andrade received. This silence, Ruiz argues, "gives rise to an inference that the district court did not consider" her position and thus deprived her of due process. As doubtful as this proposition may be, we need not consider it, since Ruiz may renew her argument at resentencing.

### D. *Ospina's Sentence.*

 As mentioned above, Ospina was sentenced at offense level 33, four levels below the district court's guideline calculation. Because we consider the reasons for departure inadequate, Ospina must be resentenced. The basis for departure essentially was the goal of sentencing Ospina to a term of imprisonment proportional to those of his more culpable codefendants. Because this is not an acceptable basis for departure, we vacate Ospina's sentence and remand for resentencing.

Recognizing that the "entire structure" of the guidelines system indicates the Com-

6. See *supra* note 2.

mission's careful consideration of sentencing disparities, we have held that effectuating proportional punishment among codefendants is not a valid ground for downward departure:

> The departure authority permits a sentencing judge to recognize that some factor concerning an individual defendant is of a kind or is present to a degree not adequately considered by the Commission. But neither Congress nor the Commission could have expected that the mere fact of a difference between the applicable guideline range for a defendant and that of his co-defendant would permit a departure, either because the difference was too large or too small. The Congressional objective was to eliminate unwarranted disparities nationwide. An applicable guideline range may seem harsh (or lenient) when compared to that of a co-defendant, but it is the same range applicable throughout the country for all offenders with the same combination of offense conduct and prior record. To reduce the sentence by a departure because the judge believes that the applicable range punishes the defendant too severely compared to a co-defendant creates a new and entirely unwarranted disparity between the defendant's sentence and that of all similarly situated defendants throughout the country.

*United States v. Joyner*, 924 F.2d at 460–61.

*Joyner* makes clear that while "disparity among co-defendants as such is not a permissible basis for departure, a sentencing judge is entitled to achieve a result that coincidentally increases or decreases the gap between sentencing ranges applicable to co-defendants if the judge finds in good faith that the statutory criterion for a departure has been met." *Id.* at 461. Ospina may thus contend on remand for a revisitation of his role in the offense or acceptance of responsibility, for both of which he was denied any adjustment at sentencing. His sentence may not be premised, however, upon a guideline departure to achieve a sentence deemed more proportionate to those imposed upon one or more codefendants.

Conclusion

The judgments of conviction of Andrade, Martinez, and Lara are affirmed. The judgments of conviction of Rivera, Ospina, and Ruiz are vacated and remanded for resentencing.