**UNITED STATES of America**

v.

**Ben Renfro STUART, Appellant.**

No. 93–7361.

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1993.

Decided April 19, 1994.

Blanche C. Clifford (Argued), Harrisburg, PA, for appellant.

William A. Behe (Argued), Office of U.S. Atty., Harrisburg, PA, for appellee.

Before: BECKER and NYGAARD, Circuit Judges, and YOHN, District Judge.*

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Ben Renfro Stuart appeals from his judgment of conviction for receipt of stolen government property, which we will affirm. He also contends the district court misapplied the guidelines in the sentence it imposed upon him. Because the district court did not decide whether Stuart was a minor participant, we will vacate the sentence and remand for resentencing.

### I.

Beatrice Noel's home was burglarized and 220 $1,000 U.S. savings bonds were stolen. Pursuant to 31 C.F.R. § 315.25, the Government replaced Noel's bonds. Later, Robert L. King contacted Don Chiarella, a Harrisburg clothing store operator, and told him that he had savings bonds that he wished to sell. Chiarella said that he knew someone in Philadelphia who could "move" the bonds for twenty cents on the dollar. Later that day, King sent Stuart to Chiarella's store to deliver twenty of the bonds in a wrapped package, apparently as a sample for Chiarella's "Philadelphia connection." Chiarella, who was working as a confidential informant, contacted Special Agent Larry Van Loon of the Federal Bureau of Investigation.

Van Loon determined that the bonds were taken in the Noel burglary. He arranged for Chiarella to introduce King to the "connection" from Philadelphia, played by Officer Taylor of the Dauphin County Drug Task Force, at a Harrisburg parking lot. A surveillance van was positioned in the parking lot with equipment to record the meeting. Taylor entered the parking lot, followed by King, Stuart and Chiarella, all in separate vehicles. Stuart positioned his car, remote from the other three, and awaited instructions from King.

Meanwhile, King, Taylor and Chiarella negotiated the sale of the bonds. Taylor paid King $4,000 for the first twenty bonds delivered to Chiarella. King told Taylor that he had an associate in the parking lot with another 109 bonds and that another seventy-five bonds could be provided the following day. Taylor agreed to pay twenty cents on the dollar and King signalled Stuart over a citizens band radio. Stuart walked across the parking lot with 109 bonds wrapped in newspaper, handed the bonds to King through the car window, then returned to his own car. Stuart was then arrested. Both Stuart and King were charged with receiving stolen property of the United States under 18 U.S.C. § 641.

The arresting officers testified at trial that Stuart (1) was given his *Miranda* warnings and agreed to speak to the investigators; (2) volunteered information that two weeks earlier, King had asked him to sell some stolen bonds; (3) said he delivered twenty bonds to Chiarella; (4) admitted that his role on the day of his arrest was to deliver another one-hundred and nine bonds after receiving a signal from King; and (5) acknowledged that he was to receive $2,000 for his services.

At trial, Stuart denied ever having been advised of his rights by the arresting officers. He further denied knowing the contents of either package he delivered, claiming that the officers told him that he had been carrying stolen bonds, which he merely confirmed under interrogation. According to Stuart, Chiarella owed King money and had given King the bonds as collateral. The purpose of the parking lot transaction, according to Stuart's testimony, was simply so Chiarella could repay King and King could return the collateral. Stuart's role, for which he said he was to receive only a $2,000 "loan," was to protect the collateral until the exchange was consummated and to witness the transaction.

The jury, however, found Stuart guilty of receiving stolen government property. At sentencing, the district court found the face value of the $129,000 in stolen bonds Stuart delivered to be the amount of the loss and applied a nine-level enhancement under

---

* Honorable William H. Yohn, Jr., United States District Judge for the Eastern District of Pennsyl- vania, sitting by designation.

U.S.S.G. § 2B1.1(b)(1)(J) (1992). The court concluded that Stuart was not a minimal participant under U.S.S.G. § 3B1.2, and was not entitled to a downward adjustment of four levels. It never explicitly ruled on whether he might have been a minor participant entitled to a two level downward adjustment.

## II.

Stuart first appeals his judgment of conviction, arguing that three of the elements of receiving stolen government property under 18 U.S.C. § 641 were not proved.[1] Those elements are:

1. receipt, possession, or concealment of,
2. stolen government property, with
3. intent to convert, and
4. knowledge that it is stolen.

*United States v. Trzcinski,* 553 F.2d 851, 854–55 (3d Cir.1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).[2]

### A.

■ Stuart first argues that because the bonds were stolen from a private citizen, they could not have been the property of the United States. The Government, however, had granted Noel relief by issuing her substitute bonds under 31 C.F.R. § 315.25 before the stolen bonds came into Stuart's possession. Any bonds for which relief has been granted become the property of the United States. 31 C.F.R. § 315.28. In two cases dealing with the retention and conversion of savings bonds that had been replaced by the government, courts have held that the bonds become the property of the United States, and we agree. *United States v. Bauer,* 713 F.2d 71, 73 (4th Cir.1983); *United States v. Carr,* 706 F.2d 1108, 1109–11 (11th Cir.1983).

■ Stuart also argues that, even if the bonds were the property of the United States, their value was not established and the Government suffered no loss. This argu-

ment has no merit. Section 641 itself defines "value" as the "face, par, or market value, or cost price, either wholesale or retail, whichever is greater." Thus, the face value of the bonds was sufficient evidence of their value.

### B.

■ Stuart next argues that he lacked the requisite *mens rea* because he had no intent to convert the stolen bonds to his private use. Indeed, he testified that King promised to loan him $2,000 for his help in delivering two packages, and that this loan had nothing to do with the contents of the two packages. Agent Van Loon testified, however, that Stuart admitted that he had helped King sell some stolen bonds, had delivered some bonds, and had been paid for it. Likewise, Trooper David Laudermilch of the Pennsylvania State Police, who participated in Stuart's arrest, testified:

> He [Stuart] said, hey, all I know, he said, is that I was to receive $2,000 for delivering these savings bonds.

From this testimony, the jury could have believed that Stuart was to be paid $2,000 for helping to fence stolen savings bonds. It was free to and apparently did conclude that Stuart intended the stolen bonds to be sold at a $2,000 gain to himself. The question of intent was a simple credibility decision, and Stuart lost.

### C.

■ Stuart's final argument attacking the sufficiency of the evidence is first that he did not know the bonds were stolen. There is simply no merit to this argument. The testimony of the arresting officers quoted above clearly indicates that Stuart knew he was trafficking in stolen property. The jury was entitled to credit that testimony and reject Stuart's. Second, Stuart contends the district court erred when, in addition to charging the jury on actual knowledge, it

1. In addition, Stuart argues that a fourth element, the value of the bonds and the loss to the Government, was also not established. We believe this argument is subsumed under the question of whether the bonds were the property of the United States.

2. Section 641 provides, in pertinent part: "Whoever receives, conceals, or retains [stolen government property] with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—" shall be fined or imprisoned.

gave the following instruction on deliberate ignorance:

> The government may prove that a person acted knowingly by proving beyond a reasonable doubt that that person deliberately closed his eyes to what otherwise would have been obvious to him. One cannot. avoid responsibility for an offense by deliberately ignoring what is obvious.

In *United States v. Caminos*, 770 F.2d 361, 365–66 (3d Cir.1985), we approved a very similar jury instruction. *Caminos,* however, involved importing cocaine in violation of 21 U.S.C. § 952, which does not contain language equivalent to section 641's "knowing it to have been embezzled, stolen, purloined or converted." Thus, it may be argued that the *mens rea* requirement is limited to *actual* knowledge. Nevertheless, we believe the rationale of *Caminos* applies here. Although not stated explicitly in the text of section 952, importation has uniformly been held to be a specific intent crime. *See, e.g., United States v. Cartwright,* 6 F.3d 294, 303 (5th Cir.1993); *United States v. Restrepo–Granda,* 575 F.2d 524, 527–29 (5th Cir.), *cert. denied,* 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978) (approving deliberate ignorance instruction); *United States v. Flickinger,* 573 F.2d 1349, 1359 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). Accordingly, we see no reason why deliberate ignorance, if proved at trial, should not be sufficient evidence of knowledge in a prosecution under 18 U.S.C. § 641. *See also United States v. Jewell,* 532 F.2d 697, 700–04 (9th Cir.) (discussing doctrine of deliberate ignorance and pointing out that it is a principle of general application in specific intent crimes), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).

■ Stuart argues that the legislative history of section 641 indicates a congressional intent that actual knowledge be required. *See* H.R.Rep. No. 120, 80th Cong., 1st Sess. 1–2 (1947). We disagree. The House Report was dealing solely with the issue of whether, in addition to knowing that the property was stolen, the defendant must also know that it was the property of the United States. In rejecting this requirement, the report noted that it would place "an undue burden" on the Government. We think that a requirement of actual knowledge would do the same. If anything, then, the legislative history indicates an intent to make prosecutions under section 641 easier, not, as Stuart argues, more difficult.

■ We therefore conclude that the district court correctly instructed the jury on the issue of deliberate ignorance. King gave Stuart a package of bonds wrapped in newspaper and instructed him to wait at the other end of the hotel parking lot until given instructions by radio to deliver the package. He was then to deliver the package and leave. For this minimal amount of work and for the previous delivery, he was to be paid $2,000. From this evidence, a jury could well find that Stuart either knew the bonds were stolen or deliberately closed his eyes to that fact. We hold that sufficient evidence supports Stuart's conviction and will affirm it.

### III.

Stuart argues that the district court erred in two ways when it computed his sentence. First, he contends that he should have received a two-level downward adjustment for his "minor" role in the offense. Second, Stuart asserts that he should not have received a nine-level enhancement based on the $129,000 face value of the bonds he delivered.

### A.

■ At sentencing, Stuart's counsel argued that Stuart was only a minimal participant in the offense and was thus entitled to a four-level downward adjustment under U.S.S.G. § 3B1.2(a). In the alternative, counsel argued that Stuart was at least entitled to a two-level or three-level downward adjustment under section 3B1.2. Counsel's argument was essentially that Stuart was no more than a delivery person in a criminal scheme developed and executed by King. The district court found that Stuart was not a *minimal* participant, but did not explicitly rule on whether his participation could be classified as *minor.*

We find that the district court's determination on minimal role in the offense is correct.

There was testimony, as discussed above, that Stuart had full knowledge of the scheme when he played his role in it. Application notes 1 and 2 to section 3B1.2(a) state that the four-level downward adjustment is to be limited to cases where the defendant is "plainly among the least culpable of those involved in the conduct of the group."[3] Note 1 states that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." There was sufficient evidence to conclude that this description did not fit Stuart's role in the offense.

■ We will remand, however, for the district court to consider whether Stuart was a "minor" participant under section 3B1.2(b), entitling him to a two-level adjustment, or whether his conduct fell somewhere in between subsections (a) and (b), warranting a three-level decrease. Application note 3 defines a minor participant as one "who is less culpable than most other participants, but whose role could not be described as minimal." It appears from this record that Stuart's conduct was less blameworthy than King's, but we leave it for the district court to decide whether it was sufficiently less culpable to warrant a decrease.

### B.

■ Before the district court and on appeal, Stuart argued that a nine-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J) (1992), representing the full $129,000 face value of the bonds recovered, overstated the seriousness of his crime, and hence his need for extensive punishment. Instead, he contended that the most he could have received from his participation was $2,000, which would result in only a two-level enhancement. Stuart's argument, however, was limited to the proper application of the Guidelines; he made no motion for a downward departure.

The district court properly applied the Guidelines. Application note 2 to section 2B1.1 states that "the loss is the fair market value of the particular property at issue." As an example, it recites that "[i]n the case of a theft of a check or money order, the loss is the loss that would have occurred if the check or money order had been cashed." Conversely, in the related context of fraud and deceit, application note 8 to section 2F1.1 states that "[t]he offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss," as we recognized in *United States v. Katora*, 981 F.2d 1398, 1406 (3d Cir.1992). Thus, in *United States v. Cianscewski*, 894 F.2d 74, 80 (3d Cir.1990), we held that the amount of loss should be determined by the face value of a check, not by its "market" or "street" value. This principle fully applies here, because in order for Stuart to be paid $2,000, $10,000 of stolen bonds would have to have been liquidated at twenty cents on the dollar.

■ Nevertheless, we are left with the definite impression that, notwithstanding the proper application of the Guidelines, a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected. At most, Stuart agreed to deliver stolen bonds on two occasions, for a total payment of $2,000. If on remand Stuart requests a downward departure, the district court may well find there to be little relationship between Stuart's role in the offense and the value of the stolen property he was carrying.

■ A district court has the authority to depart from the Guidelines if it finds that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *United States v. Bierley*, 922 F.2d 1061, 1067 (3d Cir.1990) (quoting 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0). When an atypical case falls outside the "heartland" in that "a particular guideline linguistically applies but ... the conduct significantly differs from the norm," the court may consider

---

**3.** "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erro-neous reading of, that guideline." *Stinson v. United States*, —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

whether a departure is warranted. *United States Sentencing Commission Guidelines Manual* 5–6 (1992). In making this evaluation, the court should first apply other relevant guidelines by analogy. *See Bierley*, 922 F.2d at 1069. As one court has persuasively stated:

> When departing on the basis of offense characteristics, the sentencing court should extend or extrapolate from other Guideline levels or principles, or employ analogies to closely related circumstances or conduct addressed by the Guidelines. In effect, the court predicts what level of punishment the Sentencing Commission would have assigned to the offense had it been considered in the formulation of the Guidelines.

*United States v. Strickland*, 941 F.2d 1047, 1051 (10th Cir.) (citation omitted), *cert. denied*, — U.S. —, 112 S.Ct. 614, 116 L.Ed.2d 636 (1991).

 Although the commentary to U.S.S.G. § 2B1.1 is silent on the issue, application note 10 to section 2F1.1 discusses departures and recognizes that in a few circumstances, strict application of the loss tables can overstate the seriousness of the offense. We think it is appropriate here to accept guidance from the commentary to the fraud and deceit guideline because loss and its valuation often differ little as between the crimes of theft, receipt of stolen property and fraud. Indeed, application note 7 to section 2F1.1 states that "[f]requently, loss in a fraud case will be the same as in a theft case." [4]

We find the case of *United States v. Restrepo*, 936 F.2d 661 (2d Cir.1991) to be instructive. The defendants there were laborers whose sole function was to load boxes of drug money at a warehouse. They were apprehended in a raid and pleaded guilty to a count of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). At sentencing, the district court applied the nine-level enhancement of U.S.S.G. § 2S1.1(b)(2)(J) to account for the

$18.3 million seized in the raid. It also granted the defendants a four-level downward adjustment as minimal participants under U.S.S.G. § 3B1.2, then went on to depart downward an additional four levels. On appeal, the Court of Appeals for the Second Circuit affirmed, noting that there was no real connection between the amount of money involved and the culpability of the defendants' conduct. It stated:

> We conclude that where, as here, an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense, a downward departure may be warranted on the ground that minimal participation exists to a degree not contemplated by the guidelines.

936 F.2d at 667. *See also United States v. Jackson*, 798 F.Supp. 556, 557 (D.Minn.1992) (following *Restrepo* in case involving application of U.S.S.G. § 2F1.1(b)(1) to fraudulent real estate appraisal scheme); *United States v. Dorvil*, 784 F.Supp. 849, 854 (S.D.Fla.1991) (applying *Restrepo* to offloaders of drug boat who were unaware of their role in the offense at the time of its commission).

 We think the reasoning of *Restrepo* is fundamentally sound. Where application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward. Although this case differs from *Restrepo* in that the district court here specifically rejected a downward adjustment for minimal participation, we are not convinced that any legal significance should attach to this difference. The district court premised its decision on the ground that Stuart "was well aware of what was going on." As discussed above, that fact made Stuart ineligible for the adjustment according to the literal language of the commentary. In *Bierley*, however, we specifically held that

> when an adjustment for Role in the Offense is not available by strict interpreta-

---

4. The exception, not relevant here, is that in some frauds, the defendant does not intend to cause a loss in the full amount of the property fraudulently obtained. Sometimes, in fact, no loss at all is intended. *See United States v. Kopp*,

951 F.2d 521, 526–31 (3d Cir.1991). For the purposes of this case, it matters not whether Stuart delivered 109 stolen savings bonds or 109 fraudulently obtained savings bonds.

tion of the Guideline language, the court has power to use analogic reasoning to depart from the Guidelines when the basis for departure is conduct similar to that encountered in the Role in the Offense Guideline.

922 F.2d at 1061. Here, the district court was unable to apply the full four-level downward adjustment for minimal participation because of Stuart's knowledge, but it has the power to depart if it considers Stuart's role in the offense such that the monetary loss enhancement overstated his criminal culpability and inaccurately skewed the sentencing calculus.

### IV.

■ In sum, we affirm the judgment of conviction, but we will vacate the sentence and remand the cause to the district court for it to consider in the first instance whether Stuart was a minor participant. Moreover, should Stuart on remand make a motion for downward departure, the district court has the discretion to depart from the Guidelines to the extent it finds that the nine-level loss table enhancement overstated Stuart's criminality and need for punishment.[5]

---

5. Because $10,000 in stolen bonds would have to have been fenced at twenty cents on the dollar to pay Stuart $2,000, Stuart is responsible for at least $10,000 for sentencing purposes, a four-level enhancement under U.S.S.G. § 2B1.1(b)(1)(E). Thus, the maximum permissible departure is limited to five levels.