UNITED STATES

v.

**John J. COSTELLO, III, Scott J. Dooley and Kelly Downing, Defendant.**

No. CR. 97–10103–NG.

United States District Court,
D. Massachusetts.

Jan. 8, 1998.

Joseph I. Macy, Law Office of Joseph I. Macy, Fall River, MA, Frank J. McGee, McGee & Phillips, Marshfield, MA, for John J. Costello, III.

Joseph I. Macy, Law Office of Joseph I. Macy, Fall River, MA, for Scott J. Dooley.

Charles P. McGinty, Federal Defender Office, Boston, MA, Robert Xifaras, New Bedford, MA, for Kelly Downing.

Ben T. Clements, U.S. Attorney's Office, Boston, MA, for U.S.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

Scott J. Dooley (hereinafter "Dooley") and Kelly Downing (hereinafter "Downing") have pled guilty to conspiracy to transport stolen property in interstate commerce. The indictment (Count One) charges a conspiracy from November 1996 until March 22, 1997, involving Dooley, Downing, and John J. Costello III[1] (hereinafter "Costello"). The defendants admit to stealing recordable compact discs, computer discs and software, from KAO Infosystems Company (hereinafter "KAO") in violation of 18 U.S.C. § 371.

Dooley and Downing are essentially first offenders within the meaning of the Federal Sentencing Guidelines. Despite the value of the stolen goods—variously estimated as between $200,000 (by the defendants)[2] and

---

**1.** Costello has pled guilty and is cooperating with the Government.

**2.** Defendant Downing put the loss at replacement value, between $200,000 and $350,000.

$20,859,523 (by the Government)[3] their profit was limited, $20,000 on the first transaction, and an undetermined amount, although possibly as much as $100,000 on the second.

The United States Sentencing Commission Guidelines, enacted pursuant to the Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 *et seq.* and 28 U.S.C. §§ 991–98 require the district court to impose a sentence of a king and within the range established by the Sentencing Commission for the applicable category of offense and defendant "unless the court finds an aggravating or mitigating circumstance of a kind, or to a degree, not adequately considered by the Commission in formulating the Guidelines." 18 U.S.C. § 3553(b).

The United States Sentencing Commission, *Guidelines Manual*, § 2B1.1 (Nov. 1997), points me first to the value of the loss to the victim, under the general theory that the amount of loss is an appropriate proxy for the gravity of a defendant's offense. But that is not the end of the analysis. I am obliged to look at the specific facts of the case before me, the human beings involved, the nature of the charges, and the circumstances of the offense to determine whether the factual circumstances I confront are "of a kind or to a degree not adequately taken into account by the Sentencing Commission." 18 U.S.C. § 3553(b).

To this end, I conducted hearings over three days with witnesses, memoranda and exhibits.

The Guideline calculations, according to the Probation Department, are as follows: The base offense level is four per U.S.S.G. § 2B1.1(a). Since the loss, under U.S.S.G. § 2B1.1(b)(1)(S) is $20,859,523, the base offense level is increased by 18 levels. Since the scheme involved repeated acts over a period of time which were not "purely opportune," the offense level is further increased by two levels, pursuant to U.S.S.G. § 2B1.1(b)(7)(A) to a level 24. Three points

are then deducted for acceptance of responsibility. Since both Dooley and Downing are first offenders (with a criminal history category of I), the guideline range results in a sentence of 37–46 months.

### A. *Facts about the Offense*

Costello, Dooley and Downing were employed by KAO. KAO is in the business of manufacturing and packaging for distribution a wide range of recordable compact discs, computer discs, computer software and other merchandise. Each defendant worked for KAO. Costello was in the packaging department; Dooley in the shipping department; Downing in the receiving department.

There is no question that Costello initiated the thefts. He suggested to the others that there was a market for the compact discs at KAO. Costello provided the critical piece of information—he had a buyer who would be willing to purchase any computer discs that Dooley and Downing could steal from KAO.

The indictment alleges two transactions: In December of 1996, 23–25,000 Microsoft Office 97 Professional discs were stolen and sold to Crazy Bob's in Wakefield, Massachusetts.[4] Dooley and Downing stole the discs, delivered them to Costello, who in turn sold them to Crazy Bob's.[5] Costello got a check from Crazy Bob's for $116,000. Dooley and Downing, however, were to receive $20,000 each. Costello paid Downing $20,000 and Dooley, $10,000. (Dooley was arrested before he received a second payment of $10,000.)

In the second transaction, the roles of the participants were differently configured. Dooley and Downing stole additional merchandise and attempted to make their own arrangements for its sale. An FBI informant working at KAO introduced Dooley and Downing to FBI Special Agent (hereinafter "S/A") Laurence Travaglia acting undercover as a fence from New York City. Travaglia apparently agreed to purchase 40,000 CD

---

3. The wholesale value of the first shipment was $9,677,613, and the second was $11,181,910.

4. Crazy Bob's is also being prosecuted by the federal government, although not as part of the instant case.

5. Some discs were stolen between June 1996 and December 1996. However, there is no testimony as to the quantity or value.

Roms and 18,000 Microsoft Windows 97 discs for $2.00 per disc.

## B. *Loss*

As noted above, under the Guidelines, the sentence is largely driven by the amount of the loss. The Guidelines' commentary suggests that the "loss" is the "value of the property taken damaged or destroyed." U.S.S.G. § 2B1.1 comment (n.2). The commentary adds that "ordinarily when property is taken or destroyed, the loss is the fair market value of the particular property at issue." An initial question is which market should be considered—the retail market, the wholesale market, or some other market.

▇ One commentator suggests that in order for the loss figure to reflect the seriousness of the injury to the victim, the "market used to measure the loss ought to be the market to which the victim has access." Federal Sentencing Law and Practice, § 2B1.1. If the computer were taken from the office of an accountant, for example, the victim would have to replace the equipment on the retail market, so the loss would be determined by the fair retail market value of the equipment. *Id.* If the computer were taken from the warehouse of a computer dealer, the victim would be able to replace the equipment on the wholesale market, so the loss would be determined by the fair wholesale market of the equipment. Plainly, KAO fits into the latter category. The wholesale market is where KAO would turn to replace the loss.

The defendants emphasized the unfinished nature of the products. They suggest, on the one hand, that their replacement cost was in the $15,000—$20,000 range. They offered no meaningful proof for this number. Instead, they produced the testimony of Stephen Flanagan, a computer purchaser for the Swansea school system. Flanagan was in a position to take advantage of discounts for school programs; as a result, he quoted much lower retail figures for the merchandise than the government. His testimony, however, was hardly persuasive. He did not possess the breadth of knowledge and information necessary to testify about the various markets that might be involved here. He could not provide credible expert testimony about the usual (non-school) retail market or the wholesale market.

The Government counters that while the products were unfinished, they nevertheless had a substantial value in the wholesale market. I agree. With respect to the 23–25,000 Microsoft Office 97 professional discs stolen in December 1996, and sold to Crazy Bob's, I find that the wholesale value is measured at a minimum of $11,181,910.

With respect to the items that the defendants stole in Transaction II, and intended to sell (but for the Government's intervention), the wholesale value is $9,677,613. The total loss amounts to approximately $20,859,523.

## C. *Relationship of the Loss to the Specific Facts of this Case*

▇ The purpose of the Sentencing Reform Act was not to eliminate all sentencing disparities, just "unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(6); 28 U.S.C. § 991(b)(1)(B)(same). The Guidelines regime contemplated by Congress was intended to maintain "sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not [adequately] taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1), 18 U.S.C. § 3553(b).

Accordingly, I am obliged to determine if the salient facts before me comprise "aggravating or mitigating circumstance[s] of a kind or to a degree, not adequately considered by the Commission in formulating the Guidelines." 18 U.S.C. § 3553(b). In doing so, I consider the testimony I have heard, the arguments made by counsel, the exhibits presented, the memoranda filed, the presentence reports submitted, and the allocution by the defendants.

The following facts are significant: Dooley and Downing did not come up with the scheme at the outset. Rather, it was Costello who initiated the idea, and who purported to have the contacts, individuals willing to fence the stolen merchandise. Dooley and Downing's profit, at least in the first transaction, was minuscule compared to the value of the materials stolen. Costello received a

check for $116,000; he paid Dooley $10,0000 and Downing $20,000, respectively. Their "cut" was less than 1% of the value assigned by the Government to the stolen goods.

To be sure, in the second transaction, Dooley and Downing learned their lesson: They apparently tried to deal directly with a fence, presumably in order to insure that they would get the profits of the deal, rather than merely a stipend. This time, they seemed to cut Costello out of the deal.

The second transaction, however, is more difficult to evaluate than the first. They met a fence *because of* an FBI informant, then working at KAO. The fence with whom the informant set them up was an undercover agent, S/A Laurence Travaglia. They were ultimately arrested and the stolen merchandise was recovered before any money changed hands. S/A Travaglia reported that he was willing to pay over $100,000 for the merchandise.

In determining whether a circumstance is "adequately" considered by the Commission, a court can look to the Guidelines themselves, along with its policy statements and official commentary.[6] These documents are intended to describe a "heartland," a set of typical cases. U.S.S.G. Ch.1, Pt. A. There is, however, neither a legislative history nor a Commission hearing record to aid judicial interpretation of "the heartland."

The Guideline in question U.S.S.G. is § 2B1.1. The background note is telling:

> The value of the property stolen plays an important role in determining sentences for theft and other offenses involving stolen property because it is an indicator of *both the harm to the victim and the gain to the defendant.*

U.S.S.G. § 2B1.1, comment (backg'd).

The note suggests that the reason the Commission considered value to be an appropriate proxy for evaluating culpability is because the Commission believed it reflected *both* "harm to the victim" and "gain to the

defendant." The "heartland," in effect, resides in a case where loss and gain are roughly coincident. For example, the defendant absconds with a rare painting; he will seek to sell it and reap the profits from it. In contrast, where the defendant is not the principal, where he or she is a functionary, loss to the victim and gain to the defendant are not comparable.

The Government suggests that there is always a disjunction between the loss to the victim and the gain to the defendant. In the rare painting case, for example, the thief's profits are not commensurate with the value of the painting on the open market. The thief is obliged to sell the painting to underground dealers who will discount its value.

Nevertheless, the issue here is not simply the fact of a disproportion between loss to the victim and gain to the defendant. It is the *extent* of the disproportion. This is precisely the question of "degree" not "kind," suggested by the language of 18 U.S.C. § 3553(b)(courts should consider an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Commission).

Other courts have described this in terms of the extent to which the harm, defined by the loss, overstates the culpability of the defendant. The Third Circuit has suggested that the loss can, for a peripheral defendant, "overstate both the degree of [defendant's] criminality and his need to be corrected." *United States v. Stuart*, 22 F.3d 76,82 (3d Cir.1994). The *Stuart* court specifically looked to the fraud Guideline as commentary. U.S.S.G. § 2F1 .1, comment (n.10). That section recognizes that in some situations application of the fraud loss table can overstate the seriousness of the offense. It concludes: "where application of the Guidelines' monetary table bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward." *Stuart*, 22 F.3d at 83.[7]

---

6. A district court may look to the "structure and theory of both the relevant individual guidelines and the Guidelines taken as a whole." *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir.1993).

7. The commentary to the fraud Guidelines suggest that in some respects fraud offenses are identical to theft offenses—i.e., selling worthless securities for $40,000; the loss is $40,000. U.S.S.G. § 2F1.1, comment (n.7). In other re-

I conclude that in this situation a downward departure is warranted because the $20,000,000 loss figure substantially overstates defendants' culpability.

### D. Departure

■ Section 18 U.S.C. § 3553(a) admonishes the court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes listed in the statute.[8] In doing so, I am obliged to consider the nature and circumstances of the offense, the offender, the Guidelines, the policy statements of the Commission, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and "the need to provide restitution to any victims of the offense." Id.

Restitution, now mandatory under the Mandatory Victim Restitution Act, 18 U.S.C.A. § 3663, is extremely high in this case. Adjusting for recovered goods, Dooley and Downing are jointly responsible for theft totalling $3,022,920. That figure will be offset by any amounts obtained from Crazy Bob's or any other end purchaser/user. If any portion of the restitution is unpaid at the conclusion of their sentence, the Government is authorized to obtain a lien on their property; if they manage to make any money while this amount is outstanding, the Government will have a claim on it.

Downing is twenty-eight years old and has never been incarcerated. His criminal history score is the lowest.[9] His childhood could not have been more problematic. His father, a fisherman, was away for long periods of time. He was also an alcoholic who took to beating his children; Downing and his two older brothers.

When the defendant was five, his mother was killed in an alcohol-related automobile accident. After his mother's death, his father hired a housekeeper to take care of the boys during his absence. When his father was home, Downing would spend days and evenings with his father in barrooms. When the defendant was ten years old, his father was killed, also in an alcohol related automobile accident. Friends of the defendant's parents agreed to take the defendant but not his two brothers.

Downing's childhood and young adult life were consumed with drug and alcohol problems; notwithstanding these issues, his criminal record is minor.

In connection with this charge, Downing entered the Gosnold Treatment Center in Falmouth, and then the Stephen Miller House, a treatment facility affiliated with Gosnold. He has attended counseling at Adcare in North Dartmouth Massachusetts since his release and reports that he has remained sober and participates in counselling.[10]

---

spects, the loss may overstate culpability, i.e., misrepresentation of value of an item that does have some value. Id. (comment n. 7(a)). Simply because the guideline drafters believed that fraud offenses raised this problem, the loss to victim/gain to defendant disjunction—regularly and expressly provided for it, does not mean that the observation does not also apply to theft cases.

8. Those purposes are, the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

9. Dooley has no convictions. There are a few encounters with the police which are either pending or on which he has defaulted. They

involve traffic offenses and marihuana possession charges.

10. I rejected his family history as a basis for a departure. I agree with the Government that "lack of guidance as a youth" is described in the Guidelines a prohibited ground for departure. U.S.S.G. § 5H1.2. This language apparently derives from 28 U.S.C. § 994: "The Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed and socioeconomic status of offenders." "Neutral" in the statute has been transformed into "prohibited" in the Guidelines.

I also agree that Downing's efforts at rehabilitation, while commendable, are not a basis for departure under the Guidelines.

Having decided to depart based on other factors, the loss/culpability issue, I will nevertheless consider these factors as part of my responsibility to determine the level to which the departure should be made and the sentence in that range.

 

Dooley is thirty years old. He too has the lowest criminal history score.[11] He is the oldest of four children raised in a middle class home in New Bedford. He had a good relationship with his parents, remaining at home until age nineteen, when he married. Dooley and his wife have one child born on February 1, 1997. Dooley's wife reports that her husband is the "main financial person" in their relationship; she expects to suffer financially from his incarceration. Dooley also reported regular use of marihuana until his arrest for the instant offense. Friends and relatives have written to the Court on his behalf.

I find that a departure to level fifteen is appropriate for both defendants. There is no question that each defendant must be incarcerated consistent with the purposes of sentencing, especially deterrence. The Government has reported to the Court the substantial impact of software theft on the consumer industry.

At the same time, I have no doubt that the Government's enforcement efforts have nipped their computer theft career in the bud. Dooley and Downing were little more than laborers in the first transaction. Defendants efforts to strike out on their own, having been facilitated by a government informant who introduced them to an undercover agent posing as a fence, were stopped. They learned both the enormous value of the computer merchandise they had taken, as well as the federal government's substantial interest in punishing such theft. The sentencing hearings made it quite clear to them—as did my pointed remarks—that they will face substantial incarceration if they repeat their misconduct.

Moreover, in the case of Downing, in particular, and Dooley to a lesser degree, the encounter with the federal criminal justice system has provided him with much needed substance abuse and emotional counseling.

Accordingly, I sentence the defendants to eighteen months incarceration, three years supervised release, no fine and a special assessment of $100, in addition to restitution.

11. Dooley's only prior encounter with the criminal justice system was for the charge of operating

I recommend Allenwood as the place of confinement and urge the Bureau of Prisons and Probation to make certain that both defendants receive drug and alcohol counselling before and during incarceration and afterwards on supervised release.

**SO ORDERED.**

a vehicle after his license was suspended.