**UNITED STATES of America,**

v.

**Oscar CABRERA, Defendant.**

**Criminal No. 06cr10343–NG.**

United States District Court,
D. Massachusetts.

July 25, 2008.

---

David G. Tobin, U.S. Attorney Office, Boston, MA, for United States of America.

Socrates De La Cruz, DCL Law Offices PC, Lawrence, MA, Page Kelley, Federal Defenders, Boston, MA, for Oscar Cabrera.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

## I. INTRODUCTION

Oscar Cabrera ("Cabrera") was, at most, a delivery man caught in a government sting. He hardly fits the profile of a major drug dealer. He was told—apparently at the last minute—to pick up the drugs that undercover government agents had brought from Texas. At the time of the deal, he was homeless, living out of his car; he had little or no idea about what was going on in the drug deal; he had no role in negotiating it, no money with him at the time of the sting, and was not remotely capable of investing in this drug transaction, or for that matter, any other. The real purchasers did not trust him with much, and surely not the drug money. He was to receive perhaps $250 to $500 (the amount was never set) for drugs valued far, far more than that. He had no prior criminal record. The agents had no idea who he was prior to his arrest. The real purchasers got away. Cabrera was caught—quite literally—holding the bag.

The statute under which Cabrera was prosecuted, and the Federal Sentencing Guidelines, focus largely on the quantity of drugs the defendant had, minimizing the significance of other relevant—and important—questions, like the defendant's real role in the offense or his background. 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A)(kk) call for a mandatory minimum ten-year sentence unless the defendant qualified for the "Safety Valve," 18 U.S.C. § 3553(f).[1] Happily for Cabrera, he did. The Safety Valve was intended to carve out an exception to the mandatory minimum for a certain category of drug offenders—nonviolent first offenders who had no leadership role in the offense who made a truthful proffer. But even the Guideline range of 70 to 87 months was onerous for a man in Cabrera's shoes. While deductions for a defendant's minor role are available under the Guidelines,

---

1. Cabrera was charged in a two-count indictment with conspiracy (Count 1), and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (Count 2). In addition, the indictment provided notice of the applicability of 21 U.S.C. § 841(b)(1)(A)(ii), which triggered a ten year mandatory minimum because the conspiracy involved at least five kilograms of cocaine.

they are limited and do not come close to offsetting the high quantity-driven base offense level.

If I were to follow the Guidelines and sentence Cabrera solely on the basis of the drugs government agents brought with them, the result would be a classic case of false uniformity. False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors. Drug quantity under the Guidelines treats as similar the drug dealers who stood to gain a substantial profit, here the purchasers who escaped, and the deliveryman, Cabrera, who received little more than piecework wages. *United States v. Garrison,* 560 F.Supp.2d 83, 84, 2008 WL 2121784, at *1 (D.Mass. May 20, 2008)(citing to Sandra Guerra Thompson, *The Booker Project: The Future of Federal Sentencing,* 43 Hous. L. Rev. 269, 275 n.25 (2006); Michael M. O'Hear, *The Myth of Uniformity,* 17 Fed. Sent'g Rep. 249 (2005)).

Cabrera pled guilty, without a plea agreement. I rejected the Guideline sentence for the reasons described below. I sentenced him to 24 months to be served concurrently on all counts and three years of supervised release.

## II. *FACTUAL BACKGROUND* [2]

### A. *The September 15, 2006 sting:*

On or about September 15, 2006, Special Agents ("SAs") of the Drug Enforcement Administration ("DEA") in Texas somehow came into possession of approximately fourteen kilograms of cocaine. The cocaine had been provided by Cabrera's co-defendant, Eduardo Molina,[3] to another individual, unnamed by the government, for transport to a customer in Massachusetts. Molina provided the telephone number of the intended recipient, "Enrique," who would pay $20,000 for the drugs in Massachusetts.

The DEA made arrangements for a sting to catch the putative purchaser or purchasers. On September 19, 2006, at 3:39 p.m., DEA task force agent Kevin McDonough ("McDonough"), posing as the individual who had been hired by Molina, placed a telephone call to the number that Molina provided. He spoke to an unidentified male ("UM1") who did not seem to understand English. That man turned the phone over to an unidentified female. The female indicated that she did not know anything about a cocaine delivery. The call ended.

A few hours later, at 6:12 p.m., McDonough placed another telephone call to the same number. A second unidentified male ("UM2") answered the phone. McDonough told UM2 that he was in a Holiday Inn in Peabody and that they were supposed to "do it" today. He asked when "Enrique" could come: UM2, who also seemed to have some difficulty with English, replied, "in an hour," and asked what the caller wanted him to bring.

UM2 then put an unidentified female on the phone who confirmed that the previous speaker was "Enrique." McDonough told her about the Holiday Inn, that he would be in a restaurant adjoining the hotel, and gave her his cell phone number. The fe-

---

**2.** The facts that are presented here are based on DEA reports and the defendant's safety valve proffer. Cabrera was required to give a truthful proffer of the offense and his role in it to qualify for the safety valve. 18 U.S.C. § 3553(f).

**3.** Eduardo Molina was charged in Count 1 of the superceding indictment, the conspiracy count. The matter is pending.

male indicated that she would not accompany UM2 to meet McDonough.

McDonough waited for "Enrique" in the restaurant for approximately an hour, and then called again. "Enrique" returned the call but told McDonough that he needed more time to get the money. McDonough asked "Enrique" to call him back.

At 9:10 p.m. the agents finally received a call from a third unidentified male ("UM3") who asked McDonough "who he was and why he was calling him." McDonough told UM3 that he was not trying to contact UM3 and terminated the call.

McDonough then called "Enrique" a number of times, leaving messages. He received a second call from UM3 who claimed that he had made a mistake in their earlier conversation, that he had not known who McDonough was at the time of his call. UM3 and McDonough then engaged in a conversation that was obviously about drugs. UM3 asked McDonough how many "items" he had for him; McDonough replied he had fourteen items. UM3 stated that he was the man that McDonough needed to talk to and that "Enrique" worked for him. UM3 said that he would have the money tomorrow, and asked McDonough to come to Lawrence. McDonough insisted that the meeting take place at the Holiday Inn. UM3 told McDonough that he would send someone in thirty minutes.

At approximately 10:35 p.m., DEA SA Drouin saw a white Volvo station wagon and a maroon Nissan Armada pull into the Holiday Inn parking lot at the same time. The two cars parked near one another. Drouin observed two people in the Volvo and two people in the Nissan. A male exited the front passenger side of the Volvo and walked to the front of the hotel where he sat on a bench and made a call using his cell phone. A short while later, he returned to the Volvo. Drouin then saw another male, later identified as the defendant, Oscar Cabrera, exit the front driver's side door of the Volvo and walk to the main entrance of the Holiday Inn.

While Drouin was watching the cars, McDonough received yet another call from UM3, who told him that one of "UM3's guys" was in the lobby and the other was in a red Nissan. McDonough went to the lobby, placed a call to UM3 to ask the location of the person he was to meet. McDonough then told UM3 that he wanted to meet UM3 as well. UM3 replied that they would meet when everything was clear.

McDonough found Cabrera in the lobby, shook hands and got into the elevator. Cabrera pat-frisked McDonough's waist area, apparently searching for weapons. McDonough accompanied Cabrera to room 203, which, unbeknownst to Cabrera, had been equipped with audio and video recording equipment. McDonough took a bag containing 14 kilograms of cocaine from beside the bed and placed it in front of Cabrera. Cabrera removed a number of parcels from the bag, and at McDonough's direction, counted the parcels inside the bag. Cabrera had no money with him. McDonough stated that he could not release the cocaine without the money. McDonough called UM3 and asked him to come to the hotel. UM3 indicated that he could not, but offered to give McDonough money the next day. McDonough agreed to turn over 14 kilograms of cocaine to Cabrera without receiving a dime on the promise of a future payment. While this arrangement should have been improbable to a seasoned dealer, Cabrera suspected nothing. He reports—and his record bears this out—that he had never been involved in anything like this before.

As soon as Cabrera took the bag and left the room he was arrested. After re-

ceiving *Miranda* warnings, and agreeing to waive them, he admitted that he was sent to pick up the bag. While he at first claimed ignorance about the bag's contents, he later admitted that he knew drugs were involved but had no idea how much. He was supposed to get a call with further instructions; the person who sent him was outside. He told the agents that it was the first time he was ever involved in the pick up of drugs.

Meanwhile, the agents detained three individuals, the passenger in the Volvo and the two individuals seated in the Nissan. The vehicles were searched, but when the agents found nothing incriminating in them, the individuals were released. The Volvo was seized because it was registered to Cabrera. Cabrera indicated that he did not actually own the vehicle, but that someone named "Chino" had him register the car because Chino did not have a Massachusetts license. In exchange, Cabrera could use Chino's station wagon until he found a place to live.

Cabrera's living situation, his criminal history, and the surveillance all make it abundantly clear that Cabrera was simply a deliveryman caught in a web that others had created.

### B. *Cabrera's Life Before the Sting:*

Oscar Cabrera was born in 1967 in the Dominican Republic. The defendant's father died when he was five. Cabrera was raised by his mother and stepfather, and then a family friend.

In his early twenties, he immigrated to Puerto Rico where he became a permanent resident alien. (With his conviction, he may be subject to removal proceedings.) Cabrera has two children, a fourteen year

old son, and a five year old daughter, whom he has supported.

Just prior to his arrest, Cabrera had moved out of an apartment that he had shared with Ms. Dolka Jiminez. He rented a room, and stored some of his belongings in a car. At the time of the sting, however, he was not only homeless, he was drunk. He had been consuming alcoholic beverages every day since age sixteen. His alcoholism contributed to the ending of his relationship with Ms. Jiminez. He clearly needed money to find a place to live and to send back to his mother in the Dominican Republic, who was ill.[4] He had been promised "some money" to participate in the drug transaction, which he understood to be between $250–$500. He claims that had never been involved in any drug activity and in fact, his criminal record reflects that; he has zero criminal history points.

### III. *GUIDELINES*

I begin with computations under the Sentencing Guidelines. I then explain why they are inapplicable in the case at bar. Finally, I describe the appropriate sentence under 18 U.S.C. § 3553(a).

There are two fundamental problems with the Guideline approach—the over-emphasis on quantity and the under-emphasis on role in the offense.

### A. *Quantity*

The base offense level under U.S.S.G. § 2D1.1(a)(3) is high, based on the Drug Quantity table found at U.S.S.G. § 2D1.1(c)—at least 5 kilograms of cocaine, but less than 15, for a base offense level of 32. Since the defendant qualified for the Safety Valve, U.S.S.G. § 5C1.2 (Limitation on Applicability of Statutory

---

**4.** The defendant reports that he worked in several auto body shops between 1999 and 2006, paid "under the table." His income varied greatly depending upon the work he would get. PSR ¶ 88.

Minimum Sentences), an additional two level reduction was warranted, per U.S.S.G. § 2D1.1(b)(11). With three additional points deducted for acceptance of responsibility, U.S.S.G. § 3E1.1(b), the total is 27. Since Cabrera has no record, the Guideline range was between 70 and 87 months.

As I have elsewhere noted, the Sentencing Commission has never explained how drug quantity is meant to measure offense

seriousness, and significantly, how it correlates with the purposes of sentencing under 18 U.S.C. § 3553(a). The only explanation, which one has to infer from the Guidelines, is that drug quantity is somehow a proxy for culpability. The problem is that sometimes it is an adequate proxy, and sometimes it is not.[5] *See United States v. Haynes*, 557 F.Supp.2d 200 (D.Mass.2008) (quantity measures what the police happened to have seen at the

5. At a very early point in Guideline development, 1994, a twenty-eight member Drug–Violence Task Force ("Task Force") was created to report to the United States Sentencing Commission its findings, conclusions and recommendations concerning the interrelationship (if any) between drugs and violence. Deborah W. Denno, *When Bad Things Happen to Good Intentions: The Development and Demise of A Task Force Examining the Drugs–Violence Interrelationship*, 63 Alb. L. Rev. 749, 761 (2000). In effect, the Task Force was to do what 18 U.S.C. § 3553(a) directed that the Commission do—identify the purposes that drug sentences serve and evaluate how effective they are in carrying out those purposes.

The Task Force produced a Preliminary "Final" Report which was never adopted. The divisions were predictable: While there was consensus among the social scientists about many issues, government policy makers were divided. The social scientists, for example, proposed a reexamination of the role of drug quantity in determination of offense levels because drug quantity was seen to be an inaccurate gauge of an individual's culpability and was particularly unjust for "low-end individuals who held a minor role in large quantity drug offenses." Specifically, the Task Force called for the Commission to:

Consider instead ways in which the role of the defendant can have a greater impact on the offense level calculations. Although the current guidelines consider role in the offense, this factor is diluted in large quantity cases because by the time the role adjustment is considered, the adjustment for minor role has minimal impact given the amount of time already earned by the quantity of drugs.

Denno, 63 Alb. L.Rev. at 771. And the report noted that (as of 1996, when the report was issued) there was no "research evidence

showing that convicting and imprisoning large numbers of drug offenders for long periods of time has reduced violence or drug abuse ..." *Id.* at 769. As far as sentencing alternatives, the Task Force recommended that treatment be available throughout the criminal justice system, during imprisonment and on supervised release. *Id.* at 774. *See* Albert W. Alschuler, *The Failure of the Sentencing Guidelines: A Plea for Less Aggregation*, 58 U. Chi. L. Rev. 901, 921 (1991) (arguing that basing drug sentences on the weight of the drugs possessed "would make little sense" for many offenders, including a drug courier who does not know the amount, value, or type of drug he or she has been hired to carry); Peter Reuter & Jonathan P. Caulkins, *Redefining the Goals of National Drug Policy: Recommendations from a Working Group*, 85 Am. J. Pub. Health 1059, 1062 (1995) (reporting recommendations of RAND Corporation working group which concluded that "[f]ederal sentences for drug offenders are often too severe: they offend justice, serve poorly as drug control measures, and are very expensive to carry out ... The U.S. Sentencing Commission should review its Guidelines to allow more attention to the gravity of the offense and not simply the quantity of the drug.") cited in Paul J. Hofer, *Federal Sentencing for Violent and Drug Trafficking Crimes Involving Firearms: Recent Changes and Prospects for Improvement*, 37 Am. Crim. L. Rev. 41, 72 n.106 (2000).

But apart from the recent adjustment in the crack cocaine guidelines, *see* Amendment 706 in Appendix C to the *Guidelines Manual*, U.S.S.G. Suppl. § 2D1.1 (May 1, 2008), the Commission has never reexamined the drug quantity tables along the lines that the scholarly literature, the empirical data, or the 1996 Task Force and others, recommended.

time of their surveillance, a snapshot which is not necessarily an accurate account of defendant's real culpability).

In this case, drug quantity most assuredly is not an accurate proxy. There is clearly a difference, which a fair sentence should reflect, between those who are making substantial money from the same load—in this case, the ones who got away—and a first offender, drunk all afternoon, homeless, sent on a mission about which he knew little and from which he was to make little money.[6] Moreover, the way Cabrera came into the transaction makes it clear that his culpability is unrelated to the amount of cocaine on offer. He did not negotiate the sale or know the quantity involved before meeting the agents. As far as Cabrera was concerned, the quantity was only happenstance; it could equally have been 1.4 kg or 28 kg.

Distinctions among offenders involved in this transaction should be represented in a Guideline downward departure for "role in the offense," to which I now turn.

## B. *Role*

Probation (and the Government) took the position that no adjustment for a role in offense was warranted under U.S.S.G. § 3B1.2. I fundamentally disagree.

U.S.S.G. § 3B1.2 gives the Court the authority to reduce a defendant's score if his role can be characterized as "minimal" or "minor." With respect to this reduction, the defendant bears the burden of proof. *United States v. Ocasio,* 914 F.2d 330, 332–33 (1st Cir.1990).

The Guidelines do not meaningfully define "minimal" or "minor," appropriately leaving the interpretation to the courts. *See United States v. Jurado–Lopez,* 338 F.Supp.2d 246 (D.Mass.2004). Nor did the Sentencing Commission identify why a two point reduction was appropriate for one, four points for another, rather than a larger adjustment. Indeed, the numbers appear to be wholly arbitrary.

Courts have identified two referents for determining role: First, one must look to other participants in the offense of conviction. *See United States v. Martinez–Vargas,* 321 F.3d 245, 250 (1st Cir.2003). Second, one must look to whether the defendant is "less culpable than most other persons convicted of comparable crimes."

---

**6.** Courts have applied a similar analysis in connection with the amount of loss in white collar cases. U.S.S.G. § 2B1.1 sets the base offense level based on the amount of loss. But the background note makes it clear that the reason the Commission considered value to be an appropriate proxy for culpability was because the Commission believed it reflected *"both harm to the victim* and *gain to the defendant." United States v. Costello,* 16 F.Supp.2d 36, 39 (D.Mass.1998) (internal quotation marks omitted). In effect, the heartland for this guideline involved a case where loss and gain were roughly coincident. Where the loss to the victim was far, far more than the gain to the defendant, the guideline was not applicable.

In *Costello,* for example, the defendant was to get a small amount of money for stealing computer equipment. He had been hired by a codefendant who was reaping the lion's share of the profits. Accordingly, I departed downward under the authority of U.S.S.G § 2F1.1, cmt. n.10, which recognized that the amount of loss could overstate the seriousness of the offense. I cited *United States v. Stuart,* 22 F.3d 76, 83 (3d Cir.1994), where the court said, "where application of the Guidelines' monetary table bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward."

Here, the defendant stood to gain little from a very valuable shipment of cocaine. Where the value of the drugs bears little or no relationship to his role in the offense and unfairly magnifies the sentence, a downward adjustment is appropriate.

*Id.* at 250; *see also* U.S.S.G. § 3B1.2 cmt. n.3(A).

Under the first approach, the relevant comparisons are with those who are "criminally responsible for the commission of the offense," whether indicted or not. The Court must evaluate everyone. *See* U.S.S.G. § 3B1.1, cmt. n.1. (defining "participant in the offense"). Plainly, Cabrera is less culpable than "Enrique" who arranged the purchase in Massachusetts and Molina who was entrusted with the transportation arrangement in Texas.

The second approach, comparing defendant to those convicted of comparable crimes, calls for the same conclusion. U.S.S.G. § 3B1.2 refers to adjustments for a defendant who plays a part in an offense that makes him "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n.3(A). The term "average" suggests that courts are not just to consider the facts of this case, but compare those facts more broadly to the typical cases. While the Sentencing Commission does not say so, and, as is too often the case, forces courts to intuit their rationale, one reason for using the word "average" is to "limit the government's ability to determine a defendant's role just by the way in which the crime is charged—who is included within the indictment, and who is not." *United States v. Lora,* 129 F.Supp.2d 77, 98 n. 28 (D.Mass.2001).

If "comparable" crimes under *Martinez–Vargas* or "average" participants under the Guidelines direct the Court to participants in the typical drug conspiracy, then plainly a delivery man is at the bottom of the hierarchy. *See Jurado–Lopez,* 338

F.Supp.2d at 251–52 (same conclusion with respect to a drug "mule"). Looking beyond the fortuity of whom the government caught in this sting to the importers, high level supplier, growers, money-launderers, financiers, etc., Cabrera is clearly among the least culpable. He had no role in setting up the deal, no role in negotiating the price of the drugs, and no knowledge of where the drugs were going. Indeed, it would not be surprising if Cabrera was selected precisely because he was drunk, homeless, had limited information and thus could compromise the operation as little as possible.

■ For these reasons, I will assign Cabrera a "minimal" role adjustment pursuant to U.S.S.G. § 3B1.2(a) & cmt. n.4. Because of the Guidelines' treatment of mitigating role adjustments in drug offenses, Cabrera's base offense level is adjusted downward to 30 rather than 32. *Id.* § 2D1.1(a)(3).[7] I subtract four levels for the role adjustment, *id.* § 3B1.2(a), three for acceptance of responsibility, *id.* § 3E1.1(b), and two for meeting the criteria of the safety valve, *id.* § 2D1.1(b)(11), for a total offense level of 21. With a criminal history category I, the Guidelines recommend a sentence of 37–46 months.

Even that adjustment, however, is not adequate to implement the purposes of sentencing, to which I now turn.

## IV. *FACTORS UNDER 3553(a):*

■ Considering the factors under 18 U.S.C. § 3553(a) leads to the conclusion that a further variance is required.

---

7. The usual minimal role adjustment, minus four levels, would take Cabrera to a level 23. He receives an additional adjustment under U.S.S.G. § 2D1.1(c)(4) which authorizes that the base offense level start at 30, rather than 32, and makes further reductions from that point. Although this downward adjustment is important, because it goes a small way toward acknowledging that a minor or minimal participant in drug offenses like these has little control over the quantity at issue, it is insufficient to an accurate picture of Cabrera's culpability for the reasons explained above.

On the one hand, concerns about recidivism (*see* 18 U.S.C. § 3553(a)(2)(c)) compel a sentence still substantially less than 37–46 months. The Sentencing Commission's report, *Recidivism and the "First Offender"* (May 2004), *available at* http://www. ussc.gov/publicat/Recidivism_First Offender.pdf, suggests that individuals—like Cabrera—with zero criminal history points are less likely to recidivate than all other offenders. Commission studies show that the recidivism rate for such individuals is substantially lower than recidivism rates for other offenders, and even for offenders with only one criminal history point. *Id.* at 13.

On the other hand, a sentence below twenty-four months would not be a just sentence under 18 U.S.C. § 3553(a)(2)(A)(6) (which addresses unwarranted sentencing disparity) compared to similarly situated defendants. Cabrera is, for example, more culpable than a drug mule whom I sentenced to approximately 13 months. *See United States v. Jurado-Lopez,* 338 F.Supp.2d at 254. Although a deliveryman, Cabrera was charged with picking up drugs, albeit under the watchful eye of the individuals in the hotel parking lot. But he is less culpable than another first offender whom I sentenced to 41 months—one who, though wholly inept, took steps to purchase a substantial quantity of drugs in another government sting. *See United States v. Maisonet,* 493 F.Supp.2d 255 (D.P.R.2007).

The way to address Cabrera's criminal behavior is to punish him but also to address his alcoholism, which obviously made him vulnerable. As of the time of the sentencing, he had been in pretrial detention for fifteen months, without services, treatment, or programs. Accordingly, a sentence of 24 months, with alcohol treatment to follow on supervised release, is "sufficient but not greater than necessary"

to accomplish the goals of sentencing. 18 U.S.C. § 3553(a).

**SO ORDERED.**